United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TERRENCE ING,

    Plaintiff,

v.

AMERICAN AIRLINES, a corporation doing business in the State of California, and DOES 1 through 20, inclusive,

    Defendants.
                                    /

No. C 06-02873 WHA

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Willie was a young English Bulldog. He was shipped in a kennel on American Airlines from New York to San Francisco. The owner was waiting for Willie at the airport. When Willie was delivered he was in distress and breathing shallowly. As the owner held Willie in his arms, the owner wished to rush Willie to a nearby animal hospital. American Airlines refused to allow Willie to be released. Willie died soon thereafter. American Airlines asserts that its liability is limited to fifty dollars by the air waybill.

The carrier has shown that the limitation on liability in the contract for carriage is valid, but triable issues of fact still exist as to whether defendant breached the terms of the contract. A reasonable jury could also conclude that the air waybill did not govern after plaintiff demanded Willie's return. Accordingly, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**

**STATEMENT**

On this motion by the carrier, we must take the record in the light most favorable to the opposing party (the dog owner). Plaintiff Terrence Ing owned a two-year-old English Bulldog named Willie. Willie was shipped from New York's John F. Kennedy International Airport to San Francisco International Airport on August 6, 2005, via defendant American Airlines. Jennifer Wound, the shipper, delivered Willie in a kennel to an American employee and filled out portions of air waybill 001-28271434 as instructed by an American employee (Wound Decl. ¶ 6). The entire transaction occurred approximately one hour before the flight's scheduled departure and lasted approximately 15 minutes (*id.* at ¶ 4). Wound did not view the reverse of the air waybill (*id.* at ¶ 7).

On its face the air waybill stated (*id.* at Exh. 1):

> This non-negotiable air waybill is a contract governed by law and by the provisions, on the reverse side. Such provisions, among other things, exclude or limit liability for loss, damage or delay in certain instances.

This statement was printed on a contrasting background and was located just above the line for the shipper's signature. The waybill also provided a blank space in which the shipper could declare a value for the goods shipped. To the right of that were blanks that the carrier would use to calculate the attendant increase in shipping fees. Language on the reverse of the air waybill limited American's liability to "50 cents per pound per shipment (but not less than USD 50.00) unless a higher value (not to exceed USD 1500.00) is declared on the Air Waybill at the time of acceptance by the Carrier, and the applicable charges pertaining to such higher value have been paid by the shipper" (Herbert Decl. Exh. B). Wound did not declare a higher value on the air waybill (Wound Decl. Exh. 1). Ing now admits that he did not purchase additional liability insurance, but Wound declares that she was not afforded an opportunity to make such a purchase (Ing Decl. ¶ 9; Wound Decl. ¶ 11). Wound testified at her deposition that she was, however, aware of air carriers' policies that limited liability for shipping (Reilly Decl. Exh. A at 74:22–75:4).

The air waybill incorporated by reference certain tariffs that American espouses (Herbert Decl. Exh. B). The relevant tariff stated that pug- or snub-nosed dogs "will be refused

tender if the temperature at any point in their journey is 75°F (22.5°C) or higher" (Roberts Decl. Exh. 1 ¶ 18). The tariff, as it turns out, incorrectly converted Fahrenheit to Celsius.[1] 22.5°C converts to 72.5°F, not 75 °F. Later in this litigation, American described its policy as calling for the refusal of transport of pug-nosed dogs if the temperature exceeds 75°F or 24°C (which is very close to 75°F) (Evans Decl. Exh. I-17).

The parties also differ over the exact temperature at time of departure from JFK. Relying on records obtained from the United States Department of Commerce National Oceanic and Atmospheric Administration website, Ing asserts that the temperature was between 75°F (at 6:51 a.m.) and 78°F (at 7:51 a.m.) at JFK airport (Evans Decl. Exh I-13). American contends that the temperature was at or below 75°F. Jennifer Wound testified in her deposition that before driving to the airport she checked the temperature online, "probably" at www.weather.com, a website, and it was below 75°F (Reilly Decl. Exh. A at 55:21–56:7). Kendra Harmer, an American employee, stated that she used www.weather.com to verify the temperature for the time Willie was accepted for shipment, which was 73°F, and the time of take-off, which was around 75°F (*id*. at Exh. E at 90:6–16).

The flight landed in San Francisco shortly before 10:30 a.m. (Narain Decl. ¶ 3). Parties agree that upon arrival at SFO, Willie had vomit in his kennel and was breathing shallowly. They disagree as to his physical condition. Sailesh Narain, a customer service manager for American, was called to the gate as the flight's cargo was being unloaded because a dog had vomited in the cargo area (Narain Decl. ¶ 3). There were actually two dogs on the flight; "a brown and white dog" (Willie) and "a black dog" (*ibid*.). The black dog appeared fine; Willie appeared to be sick and lethargic, but not in obvious distress (*ibid*.). Narain believed that Willie had been sedated (*ibid*.).

An American employee, Roberto Lopez, testified that Willie was dead when he arrived in the baggage area (Reilly Reply Decl. Exh. C 24:17–25:1, 30:12–18). Ing thought that Willie was alive when he saw him in the baggage area (Ing Decl. ¶ 10). Ing "asked the American

---

[1] The formula for converting degrees Farenheit to degrees Celsuis is 5/9(F-32), where F is the temperature in degrees Farenheit. Thus 75°F equals 23.9°C, and 22.5°C equals 72.5°F.

3

cargo agent if [he] could take Willie to a veterinarian, [but the agent] would not allow [him] to take Willie" (Ing. Decl. ¶ 10). American admitted that "an AA employee told Terrence Ing that Willie would not be released to Terrence Ing until a veterinarian performed a necropsy" (Evans Decl. Exh. I-16).

American then transported Willie to the cargo department (Ing Decl. ¶10). Parties dispute whether or not Ing was told that a veterinarian would be in the cargo area. American had no policy requiring an on-site veterinarian or an on-call veterinarian (Evans Decl. Exh. I-17). Parties also disagree on the extent of delay between Willie's arrival at the airport and the time he left. Ing declares that it took over four hours, whereas American admits that the ambulance arrived between 3:00 p.m. and 4:00 p.m. (Ing Decl. ¶ 11; Evans Decl. Exh. I-16). Ing signed a form giving the ambulance permission to transport Willie (Reilly Decl. Exh. G). Although Ing was aware that a necropsy would be performed on Willie, it is disputed whether Ing gave authorization for it. The necropsy revealed that Willie suffered from hypertrophic cardiomyopathy, a slow-developing heart condition.

On March 29, 2006, Ing filed this action against American in San Francisco Superior Court alleging the torts of negligence, gross negligence, trespass to chattel, conversion, and intentional infliction of emotional distress. Additionally, Ing claimed breach of bailment contract, breach of contract, violation of California Civil Procedure Code Section 3340, and violations of California Business and Professions Code Sections 17203 *et seq*. On April 27, 2006, American timely removed the case. American now moves for summary judgment as to its responsibility for Ing's damages or alternatively, partial summary judgment limiting its liability to the terms of the air waybill. On the eve of the hearing on this motion, defendant filed numerous objections to evidence presented by plaintiff in opposition to the motion for summary judgment. This order will address those objections only to the extent that such evidence is relied upon.

**ANALYSIS**

Under FRCP 56(c), summary judgment should be granted where the pleadings, discovery, and affidavits show "that there is no genuine issue as to any material fact and that the

4

1 moving party is entitled to judgment as a matter of law." The moving party has the initial
2 burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy*
3 *Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004).
4 Once the moving party has met its initial burden, the nonmoving party must "designate specific
5 facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24
6 (1986). "If the moving party shows the absence of a genuine issue of material fact, the non-
7 moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine
8 issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation
9 omitted).

### 1. FEDERAL COMMON LAW AND SHIPMENTS OF GOODS BY AIR CARRIERS.

11 Historically, federal common law applied to claims of loss of or damage of goods by
12 interstate common carriers. *Deiro v. American Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir.
13 1987). Congress passed the Civil Aeronautics Act of 1938 and the Federal Aviation Act of
14 1959 to regulate air carriers. The FAA contained a "savings provision" preserving all existing
15 common-law remedies. *Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1196
16 (9th Cir. 1999). The subsequent passage of the Airlines Deregulation Act "did not affect the
17 savings provision of federal common law remedies." *Ibid*. (citing *Deiro*, 816 F.2d at 1365).
18 Thus, federal common law still applies to common carriers, including airlines.

19 Congress expressly included a preemption clause in the Airlines Deregulation Act which
20 now reads "a State . . . may not enact or enforce a law, regulation, or other provision having the
21 force and effect of law related to a price, route, or service of an air carrier . . . ." 49 U.S.C.
22 41713(b)(1).[2] Although the Ninth Circuit has ruled that the Act did not preempt "run-of-the-
23 mill-contract" personal injury claims or routine contract claims, a claim arising from loss or
24 damage to shipped goods fit into neither category. *Read-Rite*, 186 F.3d at 1197. The Ninth
25 Circuit has held that personal-injury claims by passengers injured by improperly stored luggage

---

[2]The Act was reenacted in 1994 prior to that the clause read "no State. . . Shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to the rates, routes, or services of any air carrier. . . ." 49 U.S.C. 1305(a)(1). Congress intended the revision to make no substantive change. Pub.L. 103-272, § 1(a), 108.Stat. 745.

5

were not preempted by federal law because those claims did not deal with prices, routes, or services. *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1266 (9th Cir. 1998). After *Charas* was decided, the Ninth Circuit renewed its holding that claims for damaged or lost cargo were preempted by federal law. *Read-Rite*, 186 F.3d at 1196.

In this action, plaintiff has alleged, among other things, that he suffered loss or damage of goods because of American's actions. Ing was shipping his dog using an air carrier which constitutes an interstate shipment of cargo. Plaintiff's claims are governed by federal common law. Thus, his state-law claims under California Civil Procedure Code Section 3340 and California Business and Professions Code 17203 *et seq*. are preempted. Plaintiff argues that his claim under Section 17203 is not preempted because it arises from a violation of federal law, the Animal Welfare Act, 7 U.S.C. 2131 *et seq*. There is no private right of action, however, under the Animal Welfare Act. 7 U.S.C. 2149. At most, the Animal Welfare Act could provide a standard of care. Ing may not recover on these claims for any acts occurring during transit as they are preempted by federal law.

Federal common law also preempts plaintiff's tort claims. Federal common law dealing with interstate shipments of cargo preempts tort claims for loss or damage to goods. *Southeastern Exp. v. Pastime Amusement Co.*, 299 U.S. 28, 30 (1936). Thus, plaintiff may only recover damages on his breach of contract claim; his other claims are preempted by federal law, at least for the time that the dog was in transit.

**2.    VALIDITY OF AMERICAN'S LIMITED LIABILITY PROVISION.**

An air waybill forms the basic contract between the shipper and the air carrier. *Southeastern Pac. Trans. Co. v. Comm'l. Metals Co.*, 456 U.S. 336, 342–3 (1982). It is well established that "[l]imited liability provisions are prima facie valid if the face of the contract (or, in this case, air waybill) recites the liability limitation and the means to avoid it." *Read-Rite*, 186 F.3d at 1198 (internal quotations omitted). Once a prima facie case is made, the burden then shifts to the shipper to prove that the provision should not be enforced. *Ibid.*

American's waybills allow the shipper to opt out of the limited liability provision by declaring the value of the goods shipped and paying higher rates for shipment. The face of the

waybill contained blanks in which the shipper could declare the value of the goods shipped and a space where American could calculate the corresponding higher shipment fee (Wound Decl. Exh. 1). This establishes a prima facie case that the limited liability provisions apply.

Once a prima facie case for validity is established, the limited liability provision must then satisfy the released-valuation doctrine. "The released-valuation doctrine . . . delineates what a carrier must do to limit its liability" when there is a claim for loss or damage to goods pursuant to a shipment by carrier. *King Jewelry, Inc. v. Fed. Express Corp.*, 316 F.3d 961, 965 (9th Cir. 2003). "When a passenger's checked baggage is damaged, the reasonable communicativeness doctrine is also applicable. *Deiro*, 816 F.2d at 1364 (applying both doctrines to liability provision in passenger ticket for checked dogs); *but see Gluckman v. American Airlines, Inc.*, 844 F. Supp 151 (S.D.N.Y. 1994) (only applying the reasonable-communicativeness doctrine when dog was checked and declining use of the released-valuation doctrine for checked luggage). Plaintiff argues that the reasonable-communicativeness doctrine should also apply. Ing chose to ship Willie Priority Parcel, not as a passenger's checked baggage, thus only the released-valuation doctrine applies.

### A. The Released-Valuation Doctrine.

Under the released-valuation doctrine, the shipper "is deemed to have released the carrier from liability beyond the amount stated" in exchange for a low shipping rate. *Deiro*, 816 F.2d at 1365. The shipper is bound by the limited liability provision if he (1) has reasonable notice of the rate structure; and (2) is given a fair opportunity to pay a higher rate in order to obtain greater protection. *Deiro*, 816 F.2d at 1365.

Reasonableness of the notice is a question of law for the court to decide. *Id*. at 1364. Neither actual notice nor actual possession of the waybill by the plaintiff is required. *Kesel v. United Parcel Service Inc.*, 339 F.3d 849 (9th Cir. 2003). Air waybills stating the actual limited liability provisions on the reverse side have been held to satisfy the released-valuation doctrine. *Hill Constr. Corp. v. American Airlines, Inc.*, 996 F.2d 1315 (1st Cir. 1993) (holding that a nearly identical waybill to the one at issue in this action provided reasonable notice).

7

The waybill stated on its face (Wound Decl. Exh. 1):

> This non-negotiable air waybill is a contract governed by law and by the provisions, on the reverse side. Such provisions, among other things, exclude or limit the carrier's liability for loss, damage, or delay in certain instances.

This language was highlighted with a contrasting background and appeared just above the line for the shipper's signature. Though the actual provisions were on the reverse of the waybill, the language on the front referred the shipper to the reverse side which stated that additional liability coverage could be purchased for an extra charge. Furthermore, the left portion of the waybill's face contained a blank in which the shipper could declare a value. Spaces next to that indicated that an "excess value fee" could be added to the shipping charged based on the declared value.

Jennifer Wound, the shipper, declares that no employee from American told her that American limited its liability for loss of damages to goods (Wound Decl. ¶ 5). She testified at her deposition that she could not remember if the American Airlines employee asked her if she wanted to declare a value (Reilly Decl. Exh. A, 182:19–22). She also testified that she was familiar with the concept of declared values (*id*. at 73:24–74:4). Even taking her statements as true, the language limiting American's liability was conspicuously displayed. That Wound may not have been informed of it is immaterial. Because Wound was acting as Ing's agent in dropping off the dog to be shipped, plaintiff is deemed to have had reasonable notice of the rate structure.

Plaintiff now has the burden of showing that he did not have a fair opportunity to purchase greater liability protection. *Deiro*, 816 F.2d at 1365. In *Klicker v. Northwest Airlines*, 563 F.2d 1310 (9th Cir. 1977), the Ninth Circuit held that a complete refusal to allow the plaintiff to declare a higher value or to purchase insurance failed to fulfill the released-value doctrine.

Ing argues that Wound was not afforded a fair opportunity to purchase additional coverage because the transaction took approximately 15 minutes and occurred less than one hour before the flight left. He also maintains that American's employee did not tell Wound that she had an opportunity to purchase additional coverage, so he was denied a fair opportunity to

8

purchase additional coverage. By law, neither of these arguments prevails. Ing has presented no facts that could show that American withheld additional coverage or that its price was unreasonably high, given the market. The language on the front of the waybill stated that the carrier limited its liability and referred the shipper to the reverse side which stated that a higher value could be declared and the shipper must pay "applicable charges pertaining to such higher value" (Herbert Decl. Exh. B). Additionally, a space to declare a higher value and to calculate the corresponding fee appeared on the face of the waybill.

No amount was entered in the blank for declared value on the waybill and no additional coverage was purchased (Wound Decl. Exh. 1; Wound Decl. ¶ 11). The terms of the waybill provided a fair opportunity to purchase greater coverage; an oral offer by a American agent would simply have been duplicative. Plaintiff has failed to meet his burden to show he was not given the opportunity to purchase additional coverage. Accordingly, the limited-liability provisions of the air waybill govern, provided that no other acts invalidated the contract.

### B.     Breach of the Air Waybill's Tariffs.

The Ninth Circuit held that under federal common law, valid limited liability provisions insulate carriers from being liable for negligence, even if gross. *Deiro*, 816 F.2d at 1366. "Under federal common law, only an appropriation of property by the carrier for its own use will vitiate limits on liability." *Ibid.* Since shippers have the option of paying for additional coverage, "nothing short of intentional destruction or conduct in the nature of theft of the property will permit a shipper to circumvent [valid] liability limitations." *American Cyanamid Co. v. New Penn Motor Express, Inc.*, 979 F.2d 310, 315-316 (3d Cir. 1992).

Ing argues that this was the case; American essentially committed conversion by not releasing Willie after he had asked for him. "The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property right; and damages." *Oakdale Village Group v. Fong*, 43 Cal.App.4th 539, 543–544 (1996). Plaintiff has presented facts indicating that he was Willie's owner and that he was listed as the consignee on the waybill. Taking Ing's version of the facts as true, American refused to return Willie to allow Ing to get veterinary

9

care, which resulted in or at least precipitated Willie's death.  Furthermore, American employees have admitted that Willie was lethargic and breathing shallowly when he arrived in San Francisco.  A reasonable jury could conclude that American committed conversion by not releasing the dog to Ing until after it was dead.  If the jury did so and also concluded that American's conduct was intentional, the limited liability provision would not apply.

The limited liability provisions would also not apply if American breached the terms of the air waybill.  A carrier cannot attempt to enforce provisions of a contract that it has violated. *Coughlin v. Trans World Airlines, Inc.*, 847 F.2d 1432, 1434 (9th Cir. 1988).  In *Coughlin*, the Ninth Circuit explicitly distinguished *Deiro* because it did not deal with breach of the terms of the agreement, it only dealt with negligence.  The decision maintained *Deiro*'s holding that conduct short of appropriation or conversion could not destroy limited liability provisions, but where the carrier breached its own contract, the liability limitation did not apply.  Here, if a jury found that American breached the terms of the air waybill, the liability limitations would no longer apply.

Ing argues that American breached its tariff that refused the transport of snub-nosed dogs above a certain temperature.  "As the carrier is the tariff's author, ambiguities in its language must be strictly construed against the carrier." *Komatsu Ltd. v. States Steamship Co.*, 674 F.2d 806, 811 (9th Cir. 1982).  As stated previously, the tariff stated a temperature limit of 75°F or 22.5°C.  The tariff actually lists two different temperatures; 22.5°C converts to 72.5°F.  Because ambiguities are construed against the carrier, the lower stated temperature controls.  Wound testified in her deposition that she checked the weather and she noticed that the temperature was at least below 75°F.  Kendra Harmer, an American employee, declared that the temperature was 73°F when Willie was dropped off and 75°F at takeoff.  A reasonable juror could easily conclude that the temperature exceeded the lower limit of 72.5°F stated in the tariff.

American argues that neither high temperatures nor lack of veterinary care could have caused Willie's death because he suffered from a heart condition.  Ing presents evidence that Willie was in good condition when Wound dropped him off to be shipped.  Ing also presents the

10

expert opinion of Dr. Byron Emswiller who declares that prompt veterinary care could have saved Willie. Defendant objects to this testimony as not being based on sufficient facts. This order need not address this objection at this time. Even without an expert opinion, concluding that a sick, lethargic animal could have been helped by prompt veterinary care is a reasonable inference from the facts presented.

There are also conflicting accounts of whether or not American employees were aware that Willie was in physical distress. Defendant presents evidence that there were actually two dogs transported on the flight and that there was some initial confusion as to which dog was having health problems (Narain Decl. ¶¶ 1, 3). Silesh Narain, an American employee, declares that he believed that Willie's condition was consistent with having been sedated (*ibid*.). Neither party disputes, however, that Willie's head was pointed away from the kennel's door making it difficult to check on his condition. Thus, there still exist triable issues of fact as to whether American breached the air waybill. Defendant's motion for summary judgment is **DENIED.**

### C. Application of the Air Waybill After Consignee Demanded The Shipment.

Ing argues that the air waybill and federal common law ceased to apply after he demanded receipt of his dog. In his opposition he cites statutes governing bills of lading and common carriers. Specifically, 49 U.S.C. 80110 stated "the carrier must deliver goods covered by a bill of lading on demand of the consignee named in a nonnegotiable bill [of lading] . . . when the consignee or holder agrees to sign, on delivery of goods, a receipt for delivery if requested by the carrier." He goes on to argue that this statute creates liability if a shipper does not turn over goods to the consignee on receipt of the bill of lading.

Ing contends that the air waybill and federal common law no longer applied after he was denied return of his dog. Once he demanded Willie's return, American's subsequent acts constituted a separate incident from shipping the dog. American could be liable for damages on all his claims, including his tort claims, for the alleged four or five hours that it delayed in releasing Willie.

By its own terms, the air waybill is a contract for shipment of goods. It defies logic to think that the air waybill still insulates American from liability after it refuses to return property

11

to the consignee. It is undisputed that four or five hours elapsed between the time Ing asked for his dog and when Willie was actually given to him. It is also undisputed that Willie was still alive at the time he landed and that he was not given veterinary care. Ing and American have sharply conflicting stories as to what happened beyond that. A reasonable jury could find that American's conduct after the flight landed was a separate incident unrelated to shipping the dog. This order holds that there exist triable issues of fact as to whether the waybill still applied to American's actions after Willie had landed.

Accordingly, this order holds that federal common law preempts all of plaintiff's claims, save breach of contract, insofar as the harms occurred while the dog was in transit. The air waybill's limited liability provision is valid unless plaintiff can show that American intentionally interfered with possession of the dog or that American breached the contract. A reasonable jury could find that American's conduct after Willie arrived at SFO constituted a separate incident not covered by the waybill. Defendant's motion for summary judgment as to these issues is **GRANTED IN PART AND DENIED IN PART**.

## CONCLUSION

For all the above-stated reasons, defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: February 5, 2007

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE